### SHAW v. ERWIN.

1. LIMITATION OF ESTATES—FEE DEFEASIBLE.—A testator devised tract A to his wife, tract B to his wife for life, and tract C to his son, and if his son should die leaving no child, and testator's wife be dead, that tract C should go over. Testator further provided that the property willed to his wife for life should go at her death to his son for life, and then to his children; and if this wife die without having made disposition of tract A, and his son be dead leaving no issue, then tract A was to go over. *Held*, that the children of the son took nothing in tracts A and C as purchasers under this will, either by express gift or by implication arising from a necessity apparent on the face of the will, but that the son of testator took a fee defeasible in tract C, and that there was no remainder in tract A, either to the son or to his children.

2. IBID.—INTENTION.—The construction of the testator's intention is strengthened by his gift of tract B to his son and his children by successive remainders, with contingent remainder over to others, thus showing that testator knew how to create a remainder when he so intended.

Before IZLAR, J., Abbeville, January, 1893.

Action by James H. and Thomas C. Shaw, children of Richard P. Shaw, deceased, against Margaret and W. A. Erwin, to recover two tracts of land claimed by plaintiffs under the will of their grand-father, James H. Shaw, who died in February, 1866.

*Messrs. Graydon & Graydon*, for appellants.

*Messrs. Parker & McGowan* and *E. B. Murray*, contra.

April 7, 1894.   The opinion of the court was delivered by

MR. CHIEF JUSTICE McIVER.   In this action the plaintiffs seek to recover possession of two tracts of land, which, for convenience, may be designated as the Saluda tract and the Turkey Creek land.   The plaintiffs base their claim entirely upon the will of their grand-father, the late James H. Shaw, and undertake to set out in their complaint those portions of the will under which they claim, making, however, the will, which accompanies the complaint as an exhibit, a part of their complaint.   Those clauses upon which they rely, as taken from the will, which is set out in the "Case," read as follows: "I will to my beloved wife, Mary Shaw, for her own separate use and behoof, a tract of land situated in the district aforesaid, on Saluda River, known as the Gains and Ware tract, containing seven hundred and fifty-two acres, more or less.   I also give and bequeath to my wife, Mary Shaw, for and during her natural life, my home tract [here follows a description of said tract], all to be known as the home place, with all my stock, plantation tools, household and kitchen furniture, blacksmith tools, and provisions."   In the next clause the testator directs that certain of his property, describing it, be sold by his executor for the purpose of paying debts and funeral expenses.

The next clause reads as follows: "I will to my son, Richard P. Shaw, a sorrel horse named Charley; I also give him all the balance of my real estate, not before disposed of, consisting of two houses and lots at Donaldsville, known as the store lot and the J. F. Donald lot, also the balance of land not otherwise

disposed of on Turkey Creek; and should my son, R. P. Shaw, die leaving no child or children, and his mother being dead, I desire that the lots before mentioned at Donaldsville shall go to Margaret Dodson, the wife of A. M. Dodson, during her natural life, and then to her children, and under the same provisions the lands before mentioned on Turkey Creek shall go to my beloved nieces and nephews or their legal representatives.'' Next follows this provision: ''The property before willed to my wife, Mary Shaw, during her natural life, both real and personal, at her death shall return to my son, Richard P. Shaw, for and during his natural life, and then to his children, the issue of his body: Provided, however, my wife Mary shall have the right to dispose of such of the personal property as she may think best; and should my wife, Mary Shaw, die without making disposition by will or otherwise of the Saluda tract of land given to her by the provisions of this will, and should my son R. P. be also dead, leaving no issue, then I desire that the said tract of land should be sold, and equally divided between R. T. Kirkpatrick, Mary Pratt, Margaret Dodson, Barbara Brock, Jane Johnson, Elizabeth and Hannah Kirkpatrick, or their legal representatives; and should either of the seven before named children of Jane Taylor die leaving no child or children, then the survivors or their legal representatives shall take the share coming to such deceased child or children. And should my son, Richard P. Shaw, die without issue, then I desire that the property falling to him after the death of his mother shall be sold and equally divided between the nephews and nieces of my wife Mary and myself of the whole blood or to their legal representatives.''

It is alleged in the complaint that Richard P. Shaw departed this life on or about the 15th of September, 1891, leaving two children, the plaintiffs herein; that defendants are in possession of the premises in dispute, claiming to hold the same under conveyances from Richard P. Shaw, or G. M. Mattison as executor of the will of James H. Shaw. But, strange to say, there is no allegation in the complaint that Mary Shaw is dead, though it is there stated that she never disposed of the Saluda tract. Inasmuch, however, as this omission to allege the death

of Mary Shaw does not seem to have attracted the attention of
the Circuit Judge, although it is noticed in the argument of one
of the counsel for respondents here, we will pass it by, for the
reason that such omission cannot affect the question as to the
title to the Turkey Creek tract, and as that question will, as it
seems to us, turn upon the same principle as that relating to
the Saluda tract, we will consider the case as if it appeared in
the complaint that Mary Shaw was dead.

The question came before his honor, Judge Izlar, upon a de-
murrer to the complaint upon the ground that the allegations
contained therein were not sufficient to constitute a cause of
action; and he having reached the conclusion that the plaintiffs
had no title or interest under the will of their grand-father,
rendered judgment sustaining the demurrer and dismissing the
complaint. From this judgment plaintiffs appeal upon the
several grounds set out in the record; but as these grounds
really make but a single question, we do not propose to consi-
der them *seriatim.* That question is whether these plaintiffs, as
issue of Richard P. Shaw, can, under any proper construction
of the will of James H. Shaw, claim any title to or interest in
the land in controversy.

It is very certain that there is no direct gift to the issue of
Richard P. Shaw of any estate whatever in either of these
tracts, and, therefore, if they can take any estate at all,
it must be by implication. But it is shown by the au-
thorities cited in *Carr* v. *Porter,* 1 McCord Ch., at page
78, that an estate is never implied to issue as purchasers, and
it is distinctly decided in that case, which has been followed in
many other cases, some of which will be presently cited, that
in no case can an estate arise by implication unless from neces-
sity, and that such necessity must appear on the face of the
will. That case arose upon the construction of the will of Wil-
liam Willson, and the particular clause of the will out of which
the question arose reads as follows: "The rest and residue of my
estate, both real and personal, to be equally divided between
my two grand-sons, Wilson and Thomas, and delivered to them
at the age of twenty-one years; but should they die, leaving no
lawful issue, in that case I give and bequeath the whole of my

estate, both real and personal, to Richard Godfrey and others."
The whole estate having become vested in Thomas by the death
of his brother Willson, without issue, before attaining the age
of twenty-one years, and then Thomas having died leaving
issue, the plaintiffs, the claim was made by them that Thomas
took only a life estate, with remainder to his issue by implica-
tion; but it was held in that case that Thomas took an estate
in fee simple, and that no remainder could be implied in favor
of his issue.

It appears that the same question under the same will came
before the courts four different times. First, in the case of
*Grant* v. *Thompson* (which does not seem to have been reported),
the question came before the Court of Equity, where it was held
that Thomas took an estate for life only, with remainder by
implication to his issue as purchasers. Second, in the case of
*Carr* v. *Jeannerett*, 2 McCord, 66, the same question came before
the Court of Law, when it was held that Thomas took an estate
in fee, and there was no remainder by implication in favor of
the issue as purchasers. Third, in the case of *Carr* v. *Green*
(which is not formally reported, though the opinion of the
Court of Appeals in Equity is appended to the case just men-
tioned, and may be found in 2 McCord, at page 75), where that
court adhered to its previous conclusion in the case of *Grant* v.
*Thompson*. This conflict between the courts of law and equity
arose at a time when, under the judiciary system, there were
two courts of final resort, one a Court of Appeals of Law, com-
posed of all the Law Judges in the State, with jurisdiction to
hear and determine all appeals from the Law Courts, and the
other a Court of Appeals in Equity, composed of all the Chan-
cellors in the State, with jurisdiction to hear and determine all
appeals from the Equity Courts. But owing to the conflict of
opinion between these two courts of appeal upon this and other
important questions, the General Assembly, in December, 1824,
passed an act abolishing both of these two courts of appeal, and
substituted in their stead a separate Court of Appeals, composed
of three judges, with jurisdiction to hear and finally determine
all appeals both in law and equity. After the establishment of
this separate Court of Appeals, the same question, under the

same will, came before it, in the case of *Carr* v. *Porter*, 1 McCord Ch., *supra*, for the fourth time, and it was there finally determined that the issue of Thomas Willson could not take as purchasers an estate in remainder by implication, under the terms of the will of William Willson. That decision, so far as we are informed, has never since been questioned, and on the contrary has been followed in numerous cases; for example, in *Manigault* v. *Deas*, Bail. Eq., 298; *McLure* v. *Young*, 3 Rich. Eq., page 578; *Addison* v. *Addison*, 9 Rich. Eq., page 61.

It seems to us that this well settled principle is conclusive of the present case. It being manifest that there is no direct gift to the issue of Richard P. Shaw, such issue could take only by implication; and even if it should be conceded that issue may take as purchasers by implication in some cases, yet the case of *Carr* v. *Porter*, which practically overrules the case of *Carr* v. *Green*, cited and relied upon by counsel for appellants, conclusively shows that such implication can only arise from necessity appearing on the will. And we are unable to discover any such necessity on the face of the will of James H. Shaw. Take the devise of the Saluda tract. There can be no doubt that the devise of that tract to Mary Shaw, as first stated, would invest her with the fee, the word heirs not being necessary to create such an estate by will. What follows to change such a result: "should my wife, Mary Shaw, die without making disposition by will or otherwise of the Saluda tract of land, given to her by the provisions of this will, and should my son R. P. be also dead, leaving no issue, then I desire that the said tract of land should be sold and equally divided between R. T. Kirkpatrick" and others. This language, so far from implying an intention on the part of the testator to create an estate in remainder by implication in the issue of R. P. Shaw, rather implies the reverse. In the first place, the language necessarily implies that the testator still recognizes the fact that he had given an estate in fee to his wife, for otherwise he could not with any sort of propriety have spoken of her dying "without making disposition by will or otherwise of the Saluda tract;" and in the next place his idea manifestly was that if his wife died without disposing of that property, that it would descend to Richard as her heir,

if he were living, or if he was then dead, then it would descend to Richard's issue as her heirs, for there is no direct gift either to Richard or his issue. But if his wife died without disposing of the property, and both Richard and his issue, the wife's lineal heirs, should not be in existence, then his wish was that the property should not go to the collateral heirs of his wife, but to the persons whom he designated as remaindermen. Whether such a wish could have been carried into effect is a question which we are not now concerned with. We are only attempting to show that the language of the will, so far from implying an intention to create an estate in remainder to the issue of Richard, rather implies the contrary.

As to the Turkey Creek place, there is no doubt that the language in which that place was devised to Richard P. Shaw would create in him an estate in fee simple, unless there was something in the will manifesting some other intention. The language relied upon for this purpose is: "Should my son, R. P. Shaw, die leaving no child or children, and his mother being dead, I desire that the lots before mentioned at Donaldsville shall go to Margaret Dodson, the wife of A. M. Dodson, during her natural life, and then to her children, and under the same provisions [meaning, doubtless, the same contingencies] the lands before mentioned on Turkey Creek shall go to my beloved nieces and nephews, or their legal representatives." Now, this language, so far from raising any implication of an intention on the part of the testator that Richard was to take an estate for life only, with remainder to his issue, seems to us to indicate an intention that Richard should take the Turkey Creek in fee; but if he should die leaving no children, and his mother should be then dead, then that the Donaldsville lots should go to Mrs. Dodson, and the Turkey Creek lands to the testator's nephews and nieces. So that it seems to us, that even if we could disregard the doctrine laid down in *Carr* v. *Porter, supra,* the result would be the same; for, confining our attention to the language of the will, the intention of the testator clearly was *not* to create any life estate in either the Saluda tract or the Turkey Creek place, with remainder to the issue of Richard.

In this connection it is not without significance to notice, that though the will is inartistically drawn, yet it is manifest that whenever the testator intended to create a life estate, he knew how to express such intention, as is apparent from that provision of the will in which he disposes of the home place, a property which it is but reasonable to suppose he would desire to keep in his immediate family and descendants as long as possible; for that property is distinctly given to the wife *for life only,* with remainder to his son Richard for life only, with remainder to his issue. So, also, in providing for the estate which Mrs. Dodson was to take in the Donaldsville lots, in the event Richard should die without issue, he again distinctly says that she should take an estate for life, with remainder to her children. The following language, in the latter part of the paragraph immediately preceding the appointment of the executors, viz: "And should my son, Richard P. Shaw, die without issue, then I desire that the property falling to him after the death of his mother shall be sold and equally divided between the nephews and nieces," &c., is relied upon by appellants' counsel, in his argument here, as implying an intention to create a remainder in the issue of Richard in the Saluda tract. But it is very manifest that such language had no reference to the Saluda tract, for in a preceding part of the same paragraph he had already provided what disposition should be made of the Saluda tract in the event of the death of Richard without issue; but he had *not* provided what should become of the home place if Richard should die without issue; for he had only provided that upon the death of his wife, the property devised to her for life, the home place, should go to Richard for his life, and then to his children, without saying how that property should be disposed of if Richard died without issue. It seems to us clear, therefore, that the language last quoted was added at the close of the paragraph simply for the purpose of supplying such omission.

It seems to us that there was no error in the view taken of the case by the Circuit Judge.

The judgment of this court is, that the judgment of the Circuit Court be affirmed.